Grover T. Owens, Lasker Ehrman, W. Henry Rector, George M. Armistead, Henry M. Armistead, Owens & Ehrman, and Cockrill, Armistead & Rector, all of Little Rock, Ark., for plaintiff.

Carl E. Bailey, Atty. Gen., Thomas Fitzhugh, Asst. Atty. Gen., and Charles T. Coleman and Walter L. Pope, both of Little Rock, Ark., for defendants.

Before WOODROUGH, Circuit Judge, and MARTINEAU and RAGON, District Judges.

**PELTASON, TENENBAUM & HARRIS, Inc., v. REFUNDING BOARD OF ARKANSAS et al.**

**No. 2758.**

District Court, W. D. Arkansas, E. D.

Dec. 17, 1935.

WOODROUGH, Circuit Judge.

This suit was brought by the holder of Arkansas road district refunding bonds, series B, to enjoin the execution of an order of the refunding board of the state of Arkansas, which order would cause all the moneys in the state highway fund to be applied to the purchase of bonds in series A, leaving none for the purchase of plaintiff's bonds; and to compel the application of a part of the money in the fund to the purchase of plaintiff's B bonds. Other holders of B bonds, in the same situation as plaintiff have intervened, praying similarly as to the B bonds which they have tendered. The B bonds were issued on account of outstanding interest coupons attached to earlier bonds, and the A bonds were issued for the principal. Both the A bonds and the B bonds mature in 1949,

but the A bonds draw interest at the rate of 3 per cent. per annum, payable semiannually, and the B bonds are payable without interest. The state officers claim the right to apply all the moneys now in the special fund to the purchase of A bonds which have been tendered to them for a price less than 75 cents on the dollar of face value of the bonds. The plaintiff and interveners insist that such application of the moneys and the refusal to take up their B bonds at the price at which they have been tendered to the board are violative of the contract, due process, and equal protection clauses of the Federal Constitution (article 1, § 10, cl. 1; Amend. 14, § 1), and of section 17, article 2, of the Constitution of Arkansas. Hearing on the application for temporary writ was had before the statutory three-judge court. 28 U.S. C.A. § 380.

■ Act No. 11 of the Second Extra Session of the General Assembly of Arkansas for the year 1934 (page 28) provides for the creation of an account in the state treasury out of the proceeds of taxes from the sale of gasoline and oil and the use of automobiles, to be known as the state highway fund, the moneys in the fund being first applicable to the maintenance of the highways and toll bridges and to the payment of interest upon bonds and other obligations. The act further provides that for the year 1935 68.6 per cent. of the excess revenues in the fund shall be placed in a special account declared to be a trust fund for the purchase or redemption of the principal of road district refunding bonds series A and series B. The surplus receipts for 1934 which were so accumulated in the special account in 1935 amounted to $697,022.76, all of which was applicable to the purchase or redemption of the A and B bonds in accordance with sections 37 and 38 of the act (pages 62, 64). Those sections require that such surplus shall be used each year to purchase A and B bonds "at the lowest price submitted, not exceeding par and accrued interest, in the manner hereinafter provided." The state treasurer shall advertise for tenders to be made by the owners of the bonds in sealed envelopes, and "all funds on hand available for the purchase of the respective obligations shall be applied immediately in the purchase of obligations tendered at the lowest price submitted. In determining the lower of the tenders the Board shall take into consideration the rate of interest of the tendered obligations." "In determining what is the best bid submitted the Board shall consider the interest rate, maturity and all other proper elements which have a bearing upon fixing the value of the respective bonds offered."

In response to the advertisement calling for tenders of bonds, the plaintiff and interveners duly tendered to the refunding board their series B bonds at prices ranging from 44⅞ to 45⁵⁄₁₀ per cent., the largest amount of the B bonds ($144,192.29 par value) being tendered at 44.97 per cent. of the par value thereof. But the board refused to accept any of said B bonds, and ordered instead that all of the money in the fund applicable to the purchase of refunding bonds should be applied to the purchase of series A bonds tendered at prices of 75 or less, with the exception of one bidder with a large block of A bonds tendered at 75, and in that instance the board accepted a portion of the bonds tendered by that bidder.

In order to determine the comparative price of the bonds of the two series tendered to the board, it is necessary to make a mathematical computation, taking into consideration the fact that the series A bonds bear interest while those of series B do not. The evidence before us shows that such mathematical computation was made, and it was determined thereby that series B bonds tendered at 44.97 were equivalent in price to series A bonds at 72.753. It was further determined that series A bonds at 75.10 are equivalent to series B bonds at 46.88; and that series A bonds at 74.72 are equivalent to series B bonds at 46.58. It was further determined that, if no series B bonds were purchased, the refunding board could accept the tender of all series A bonds offered at 74.99 or less, and could accept a large number of the series A bonds tendered at 75; that, had the refunding board accepted offers of series B bonds which were tendered at lower prices than the prices at which series A bonds were tendered, the sum of $119,279.16 would have been required for that purpose, and the remaining available funds could have been used for the purchase of all series A bonds tendered at prices of 74.96 or less; that all of the series B bonds tendered by the plaintiff and the interveners were offered at prices lower than 46.76, which is the equivalent of series A bonds at 74.95.

It is contended for the defendants that the statute vests a discretion in the refunding board to determine which of the ten-

ders of bonds of either series A or series B or both it shall accept and that the board is not bound to accept the bonds offered at the figure which is shown to be lowest by mathematical computation. It is argued that, aside from the fact that the A bonds draw interest and the B bonds do not draw interest, definite advantages would accrue to the state of Arkansas and its citizens if the A bonds are taken up instead of the B bonds. The position of the state officers is that, if the mathematical computation shows that the B bonds are tendered at a very small reduction below the comparative price at which the A bonds are tendered, having regard to the interest payable on the A bonds and not on the B bonds, the discretion may be exercised consistently with the statute in favor of taking up the A bonds instead of the B bonds, and, in the present case, the difference in the price offered between the A bonds and the plaintiff's B bonds is admittedly small.

We are not persuaded that the statute can be construed as contended for by the defendants. We think the clear intendment is that the duty of the board in the situation here presented is ministerial merely, and requires that the board shall "take into consideration the rate of interest of the tendered obligations and the maturity," and, having made the necessary mathematical computation, shall accept the tenders "at the lowest price submitted, not exceeding par and accrued interest."

Defendants' reliance is upon the following language of the act (section 37) : "In determining what is the best bid submitted the Board shall consider the interest rate, maturity and all other proper elements which have a bearing upon fixing the value of the respective bonds offered for sale. The purpose of the Board being to act for the best interest of the State of Arkansas and its citizens."

We do not deem it necessary to hold, as contended for the plaintiff, that such provision is entirely surplusage. It may be that circumstances could arise in the administration of the act where, as between conflicting tenders of bonds, it might become necessary to take into consideration other elements than difference of price. But the legislative command to take up the bonds at the lowest price offered is reiterated in the act. It is peremptory and absolutely controlling upon the board, and, as between the various tenders that are disclosed by the record in this case, there are no elements bearing upon fixing the value of the respective bonds except the difference in price. The whole duty of the board, therefore, is to take the lowest offer as mathematically computed.

■ The defendants contend that this suit is one against the state, and that jurisdiction is denied by the Eleventh Amendment to the Constitution.

Act No. 11 of the Second Extra Session of 1934 constitutes a contract between the state and the holders of the bonds issued in accordance therewith, the terms of which cannot be impaired either by subsequent legislation or by a course of procedure on the part of state officers which would deprive the holders of bonds of the rights accorded to them by the statute. Cherry v. Leonard, 189 Ark. 869, 75 S.W. (2d) 401. One of the rights clearly secured to the holders of the B bonds is that, upon making a tender of their bonds at the lowest rate, the same will be accepted by the refunding board and paid for at the rate at which they are tendered out of the fund which the state maintains as a trust fund for that purpose. In this suit the holders of the B bonds are not asserting any right or seeking any relief against the state of Arkansas. Their claim is that the officers of the state, by refusing to carry out the terms of the statute, that is, by refusing to take the B bonds offered at the lowest price, are denying rights accorded to the holders of B bonds by the terms of the statute, and they assert that the conduct of the officers is contrary to the statute. Such a suit is not against the state. It is against the officers merely, and the Eleventh Amendment does not limit the jurisdiction over suits against state officers and agents. Cargile v. New York Trust Co. (C.C.A.) 67 F.(2d) 585, 587. The law applicable is clearly stated by the Supreme Court in Board of Liquidation v. McComb, 92 U.S. 531, 541, 23 L.Ed. 623, as follows:

"On this branch of the subject the numerous and well-considered cases heretofore decided by this court leaves little to be said. The objections to proceeding against State officers by mandamus or injunction are: first, that it is, in effect, proceeding against the State itself; and, secondly, that it interferes with the official discretion vested in the officers. It is conceded that neither of these things can be done. A State, without its consent, cannot be sued by an individual; and a court can-

not substitute its own discretion for that of executive officers in matters belonging to the proper jurisdiction of the latter. But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases, the writs of mandamus and injunction are somewhat correlative to each other."

The controlling cases have been collated in Cargile v. New York Trust Company, supra; and Hubbell v. Leonard (D. C.) 6 F.Supp. 145.

■ A point is made by the defendants that, in order to benefit the plaintiff, the order of the court in this case must require the state officers to purchase bonds and to pay out the moneys of the state from its treasury to consummate the transaction, and numerous cases are cited to the effect that the state can not be so judicially coerced. We think none of such cases are applicable to the case before us. Although the statute refers to a "purchase" of bonds, consideration of the procedure prescribed by the act makes it clear that there is no sale or purchase in the ordinary sense of a meeting of minds upon terms of a contract of sale between seller and buyer. All that is involved is the ministerial action of the board in making, or causing to be made, the mathematical computation as to the comparative prices of the various bonds tendered and to accept those tenders shown on such computation to be lowest in price.

■ As a separate defense, it has been shown that, after the United States District Judge had allowed a restraining order in this case, an owner of A bonds filed a suit in the circuit court of Pulaski county, Ark., alleging that he had tendered his A bonds to the refunding board, and that the same had been accepted under the order sought to be enjoined in this case, and he prayed that writ of mandamus issue to the board directing it to carry out its order made for the purchase of bonds. The refunding board filed a response, asking that the proceedings (that is, its own order) be stayed under Act No. 94 of the Acts of Arkansas of 1935 (page 225), and subsequently such an order was entered by the circuit court of Arkansas staying the orders of the refunding board involved here "pending the determination of this suit in this court." Subsequently the plaintiff in the suit in the state court sold his bonds and requested the state court to dismiss his action at his costs. The suit had not been dismissed, however, at the time we took submission of this case. While the hearing before us was proceeding, it was made to appear that a party had intervened in the case in the state court claiming to be a taxpayer and asking that the order of the board involved in this case be enforced. The defendants contend that the effect of the action in the state court and the stay entered there is to prevent this court from proceeding with this cause under the act of Congress, 28 U.S.C.A. § 380, and Act No. 94 of the Acts of Arkansas 1935.

It does not appear that the case brought in the state court and the stay that has been issued therein come within the purview of the acts above cited. The plaintiff in the case and the intervener (if there is one) and the members of the refunding board are all lined up seeking the same judgment of the court. The refunding board wants its order to prevail, and is strenuously resisting any attack against the order. The plaintiff in the state case, when there was one, was in the same attitude, and so is the alleged intervener. There is no actual conflict of interest or dispute or controversy, nor is there a suit pending in the ordinary sense and meaning of the terms. What has been done is to present an appearance of controversy and suit, but there is really only a sham proceeding in which no real disputes are to be litigated or conflict of interests determined. We think it clear that such a proceeding does not divest this court of its jurisdiction or relieve it from the duty of proceeding with this case. We have considered the cases cited on the point, but have rested our conclusion on the sham and fictitious nature of the controversy presented to the state court. Union Light, Heat & Power Co. v. Railroad Commission (D.C.) 17 F.(2d) 143; J. & A. Freiberg Co. v. Dawson (D. C.) 274 F. 420, affirmed Dawson v. Kentucky Distilleries & Warehouse Co., 255 U.S. 288, 41 S.Ct. 272, 65 L.Ed. 638; Northwestern Bell Telephone Co. v. Hilton (D.C.) 274 F. 384; Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659.

Our conclusion is that temporary order of injunction should issue as prayed, and we have made and filed our findings of fact and conclusions herewith. The order allowing injunction is this day filed with the clerk. Exceptions are allowed to each of the findings and conclusions and decree.